UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUDITH BADGLEY,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | Case No. 17-cv-00877-HSG<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 44, 46 |

On January 23, 2017, Plaintiff Judith Badgley, as Executor of the Estate of Patricia Yoder ("the Estate"),[1] filed this action against Defendant United States of America, seeking a refund for an alleged overpayment of $3,810,004 in estate taxes under 26 U.S.C. § 7422. *See* Dkt. No. 8 ("FAC") ¶¶ 4, 13. Currently pending before the Court are Plaintiff and Defendant's cross motions for summary judgment. *See* Dkt. Nos. 44 ("Pl. Mot."), 47 ("Def. Opp."), 48 ("Pl. Reply"), 46 ("Def. Mot."), 49 ("Pl. Opp."), 51 ("Def. Reply").[2] On January 4, 2018, the Court heard argument on the motions. After carefully considering the parties' arguments, the Court **GRANTS** Defendant's motion, and **DENIES** Plaintiff's motion.

## I. BACKGROUND

Unless otherwise noted, the facts set forth in this section are not disputed. As necessary, the Court discusses further factual details in the course of its analysis.

---

[1] Because several individuals involved in this action share the surname "Yoder," this Order refers to members of the Yoder family by their first names.
[2] Plaintiff requests that the Court take judicial notice of several other filings in this case. *See* Dkt. Nos. 45, 50. The Court **GRANTS** Plaintiff's requests for judicial notice to the extent that the Court recognizes the existence of these publicly available documents.

**A. Factual Background**

In 1976, brothers Donald Yoder and H. Frank Yoder III created a partnership called Y&Y Company ("Y&Y Co.") to manage several parcels of California real estate. Dkt. No. 46-3 ("Badgley Dep."), 17:4-12; Dkt. No. 46-6 ("Frank Yoder Dep."), 9:8-17; *see also* Dkt. No. 44-2 ("Pl. Ex. A"). Donald was also a half partner in Yoder and Yoder, which he co-owned with his father. Frank Yoder Dep., 18:2-7. Patricia Yoder was married to Donald. Dkt. No. 44-4 ("Pl. Ex. C") at 32. In 1982, Patricia and Donald created the D&P Yoder Revocable Trust, which held Donald's interest in both partnerships. Pl. Ex. C at 70; *see also* Dkt. No. 44-3 ("Pl. Ex. B") at 25. Donald died in 1990. Dkt. No. 46-4 ("Pamela Yoder Dep."), 7:12-20; *see also* Pl. Ex. B at 25. Patricia then became a one-half partner in both Y&Y Co. and Yoder and Yoder. Frank Yoder Dep., 16:12-17. Y&Y Co. partnership documents dating to 1997 reflect this transfer of the partnership interest from Donald to Patricia. *See* Pl. Ex. B; Frank Yoder Dep., 31:1-8.

By the 1990s, Y&Y Co. owned three multi-tenant parcels of real estate in Southern California. Badgley Dep., 16:1-9; Pamela Yoder Dep., 27:12-19, 71:15-22. Y&Y Co. did not acquire or sell any properties between 1998 and 2012. Badgley Dep., 30:23-31:3; Pamela Yoder Dep., 32:21-24. Patricia became involved in Y&Y Co.'s affairs after Donald passed away in 1990. Badgley Dep., 60:2-19, 126:25-128:12. Yoder Development (now owned by Donald and Patricia's daughter, Pamela Yoder) managed the properties of Y&Y Co. from the 1980s onward. Badgley Dep., 16:12-19, 18:9-15, 27:13-24; Pamela Yoder Dep., 16:2-17:15, 25:19-23; Dkt. No. 46-7 ("RFA"), RFA #2.

On February 1, 1998, Patricia created the Patricia Yoder Grantor-Retained Annuity Trust, which she funded with her one-half partnership interest in Y&Y Co. Badgley Dep. 56:14-25; *see* Dkt. No. 44-7 ("GRAT"), Schedule A ("Property Transferred and Delivered to the Trustee[,] 50% partnership interest in Y&Y Company, a California general partnership[.]"). Patricia placed into the GRAT the three properties that were owned by Y&Y Co. Badgley Dep., 56:20-25. The transfer was not a bona fide sale, and no consideration was given in exchange for the transfer. RFA #49. The GRAT states that Patricia Yoder was to receive annual annuity payments for the lesser of fifteen years or her prior death (paid quarterly) equal to 12.5% of the date-of-gift value of

2

the property transferred to the GRAT. GRAT at 1-3. In 1998, the GRAT paid Patricia an annuity in the amount of $302,259 per year in quarterly payments, which represented 12.5% of the date-of-gift value of the one-half Y&Y Co. partnership interest. GRAT at 2; RFA ##30-31.

Under the GRAT, the Y&Y partnership interest was to pass to Patricia's two living daughters, Plaintiff and Pamela Yoder, on the completion of Patricia's annuity payments. Badgley Dep., 59:7-60:1; *see* GRAT at 3; Def. Mot. at 5. The GRAT also states: "If the Trustor fails to survive the Trust Term, the Trustee shall pay all remaining amounts due under the obligation to pay the annuity as set forth herein together with the portion of the Trust Estate includible in the Trustor's gross estate to the Trustee of the Survivor's Trust created under the D & P Yoder Revocable Trust dated July 26, 1990."[3] GRAT at 3. Plaintiff explains that "[t]he reason for the GRAT was to enable Patricia to make a gift to her daughters Pamela and Judith of the GRAT corpus remaining after paying Patricia a fixed annuity for a term of 15 years." Pl. Mot. at 11; *see* Dkt. No. 44-25 ("Badgley Dep. 2"), 59:7-16. The GRAT provides that "[i]f at any time the Trustor becomes unable or unwilling to act as Trustee, the persons listed below shall serve as successor Trustees in the order named. First: Pamela A. Yoder[.] Second: Judith M. Badgley." GRAT at 4; *see* Pl. Mot. at 11. Patricia signed the GRAT as Trustor and Trustee, and Judith and Pamela signed as Special Trustees. Def. Mot at 5; *see* GRAT at 5-6.

At least as early as 2002, the income generated by the Y&Y Co. partnership was sufficient to fund Patricia's quarterly annual annuity payments. *See* Dkt. No. 46-9 ("Def. Ex. 7"); Def. Mot. at 6; Def. Reply at 3.[4] Between 2002 and 2012, Y&Y Co. reported income of $999,192 (2002), $1,119,383 (2003), $1,120,283 (2004), $1,197,510 (2005), $1,319,704 (2006), $1,306,287 (2007),

---

[3] Along with this fact, Defendant presents a graphic image that Defendant represents as showing the relationship between the GRAT, the revocable trust, and the Yoders. *See* Def. Mot. at 4. Plaintiff disputes Defendant's "graphic depiction of 'Y&Y Ownership 1998-D.O.D. (4:11-25)' to the extent that it incorrectly shows Patricia Yoder as the trustee of the GRAT at the date of her death." Pl. Opp. at 3-4. In this Order, the Court does not rely on Defendant's graphic depiction or Patricia's status as trustee. Thus, these facts are not material even if they are disputed.

[4] While Plaintiff disputes Defendant's characterization of income as "steady," Plaintiff does not dispute the facts as stated by Defendant. *See* Pl. Opp. at 5. Plaintiff argues only that Y&Y Co.'s income was unpredictable and did not match the annuity; Plaintiff does not disagree that this income was always greater than the annuity payment during the operative time period. *See id.*; Def. Reply at 3.

$1,325,478 (2008), $1,125,718 (2009), $994,642 (2010), $1,179,989 (2011) and $1,219,227 (2012); on the Forms K1 it issued to its partners, it allocated half of its income to the GRAT. *See id.*; Dkt. Nos. 46-10 ("Def. Ex. 8"), 46-11 ("Def. Ex. 9"), 46-12 ("Def. Ex. 10"), 46-13 ("Def. Ex. 11"), 46-14 ("Def. Ex. 12"), 44-16 ("Pl. Ex. M"), 44-17 ("Pl. Ex. N"), 44-18 ("Pl. Ex. O"), 44-19 ("Pl. Ex. P"), 44-20 ("Pl. Ex. Q"); *see also* Badgley Dep., 82:10-83:24;. Y&Y Co. also made cash distributions to the GRAT during this time that ranged from $435,400 to $730,000. *Id.* Patricia reported that the GRAT's share of Y&Y Co. income was larger than her annual annuity of $302,259. Def. Mot. at 7; *see* Dkt. Nos. 44-21 ("Pl. Ex. R"), 44-22 ("Pl. Ex. S"), 44-23 ("Pl. Ex. T").[5]

Y&Y Co. distributions were paid to a bank account in the name of the GRAT. Badgley Dep., 82:10-83:24, 129:3-8. Patricia controlled that account. *Id.* Patricia used the account to make quarterly annuity payments to her personal accounts. Dkt. No. 46-8 ("Def. Ex. 6") at 6-8, 11 (Plaintiff's Interrogatory Responses ## 3, 4, 6, 15). Patricia managed and invested the excess Y&Y Co. distributions after making GRAT annuity payments by transferring excess funds to other investment accounts. Badgley Dep., 96:16-24, 129:3-18. Patricia's involvement with Y&Y Co.'s affairs stayed the same after she transferred her one-half interest in the GRAT.[6] Pamela Yoder Dep. 73:13-25, 100:12-16; Badgley Dep., 127:15-23. For instance, Patricia assisted in hiring new office staff, and was authorized to make payments on behalf of Y&Y Co. Badgley Dep. 60:14-18, 126:25-128:23; Pamela Yoder Dep. 62:17-63:16, 67:23-69:20. In addition, Patricia had the authority to replace Pamela as property manager for Yoder Development. *See* Badgley Dep. at 128:13-129:2; Pamela Yoder Dep., 85:21-86:9. Patricia, at least in 2008,

---

[5] Plaintiff disputes this fact to the extent that Defendant suggests "that Patricia treated the income of Y&Y company as her money." Pl. Opp. at 6. Defendant offers these facts to show only that Patricia received some personal benefit from Y&Y Co.'s income, even if the income is not technically "hers." *See* Def. Reply at 3. Thus, to the extent that a dispute of fact exists, that dispute is not "genuine."

[6] Plaintiff presents an "important point of clarification" regarding Patricia's involvement with Y&Y Co. after she transferred her interest to the GRAT. Pl. Opp. at 5. Plaintiff clarifies that from that point forward, Patricia acted "not in her individual capacity," but rather in a fiduciary capacity as trustee. *Id.* This is not a dispute of material fact: Plaintiff's distinction is not relevant to whether Patricia did *in fact* take these actions. Plaintiff similarly does not even characterize her own point as a "dispute."

approved an increase in management fees paid to Yoder Development by Y&Y Co. Pamela Yoder Dep., 51:2-52:7, 21:9-22:17.

Patricia died on November 2, 2012. Badgley Dep., 12:16-23. Patricia received her last annuity payment from the GRAT on September 30, 2012, in the amount of $75,564.75. Def. Ex. 6 at 11 ("Plaintiff's Interrogatory Responses #15"). Patricia was hospitalized approximately two weeks before her death. Badgley Dep., 67:15-17. The day before Patricia's death, Judith and Pamela obtained a letter from Dr. John Storch, MD, stating that Patricia could not manage her financial affairs. Dkt. No. 44-14 ("Pl. Ex. L"); Badgley Dep., 68:12-69:23. No quarterly payments were due, and no payments were made, between the date of Patricia's hospitalization and her death. Badgley Dep., 81:18-24; RFA #45. Patricia died before the expiration of her GRAT term. Pl. Mot. at 14.

### B. Procedural History

On January 29, 2014, Pamela signed a tax return on behalf of the Estate of Patricia Yoder. *See* Dkt. No. 44-9 ("Pl. Ex. H"). The return reported a total gross estate of $36,829,057, including the value of the assets held in the GRAT. *See id.*; Dkt. No. 46-5 ("Hipshman Dep."), 17:6-25; RFA # 8. The Estate paid the reported taxes of $11,187,475. *Id.* On May 16, 2016, Plaintiff filed a Claim for Refund and Request for Abatement, seeking a refund from the Internal Revenue Service ("IRS") of $3,810,004 in estate tax alleged to have been overpaid by the Estate as a result of the inclusion of the full value of the GRAT. Badgley Dep. 116:10-25; Dkt No. 44-12. ("Pl. Ex. K"). The IRS did not advise on the allowance or disallowance of the refund claim within six months of its filing. Pl. Mot. at 15. Plaintiff, as the taxpayer's representative, subsequently filed this action in the Central District of California. *Id.* at 15-16; *see* Dkt. No. 1. On January 30, 2017, Plaintiff filed the FAC, and on February 23, 2017, the case was transferred to this district based on the parties' stipulation. *See* Dkt. Nos. 10-11.

## II. LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.* The Court views the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008).

The moving party bears both the ultimate burden of persuasion and the initial burden of producing those portions of the pleadings, discovery, and affidavits that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will not bear the burden of proof on an issue at trial, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Where the moving party will bear the burden of proof on an issue at trial, it must also show that no reasonable trier of fact could not find in its favor. *Celotex Corp.*, 477 U.S. at 325. In either case, the movant "may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence." *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1105. "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Id.* at 1102-03.

"If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103. In doing so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. A nonmoving party must also "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). If a nonmoving party fails to produce evidence that supports its claim or defense, courts enter summary judgment in favor of the movant. *Celotex Corp.*, 477 U.S.

at 323.

## III. DISCUSSION

Plaintiff moves for summary judgment on two principal bases, asserting that: (1) Internal Revenue Code ("IRC") § 2036(a)(1) does not apply to Patricia's GRAT; and (2) Treasury Regulation 20.2036-1(c)(2)(i) ("the Regulation") is overly broad and invalid to the extent that it applies to the GRAT. On this basis, Plaintiff asserts that Defendant improperly included the GRAT in calculating Patricia's gross estate, and Plaintiff is entitled to a tax refund. Defendant moves for summary judgment on the opposite grounds, arguing that section 2036 applies to Patricia's GRAT and that the Regulation is valid.

### A. Section 2036 Applies to Patricia's GRAT and the GRAT Property Was Properly Included in Patricia's Gross Estate

The parties agree that IRC section 2036 controls. That section states:

> (a) *The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale* for an adequate and full consideration in money or money's worth), *by trust or otherwise*, under *which he has retained for his life* or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death-
>
> *(1) the possession or enjoyment of, or the right to the income from, the property,* or
>
> **(2)** the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

(emphasis added). Defendant contends that section 2036(a)'s "possession or enjoyment of" or "right to income" language applies to Patricia's GRAT for two alternative reasons: first, because Patricia reserved a right to annual annuity payments from the GRAT, which she created with her one-half share in Y&Y Co.; and second, because Patricia possessed and enjoyed the property because she retained "other interests and powers" in Y&Y Co., including her control over and personal benefit from Y&Y Co. activities. *See* Def. Mot. at 12.

In arguing that Patricia's fixed annuity qualifies as some possession, enjoyment, or right to income within the meaning of section 2036(a)(1), Defendant relies primarily on three cases that it characterizes as reflecting the Supreme Court's broad understanding of the operative language.

7

Def. Mot. at 11-13; *see C.I.R. v. Church's Estate*, 335 U.S. 632 (1949); *Spiegel's Estate v. Comm'r*, 335 U.S. 701 (1949). Both *Church's* and *Spiegel's* interpret IRC section 811(c), section 2036(a)'s predecessor, and build on the Supreme Court's prior decision in *Helvering v. Hallock*, 309 U.S. 106 (1940). *Hallock*, in turn, interprets section 302(c), the predecessor to section 811(c). Defendant argues that the statutory language has remained substantively the same despite these changes, and Plaintiff does not dispute that proposition. *See* Def. Mot. at 12.

Rather, Plaintiff highlights the absence of statutory or judicial authority expressly equating a fixed-term annuity with some possession, enjoyment or right to income. *See* Pl. Opp. at 8. Plaintiff stresses that section 2036 could state that a right to income includes an "annuity" had Congress so desired. *Id.* At the core of Plaintiff's position is a distinction between "a fixed annuity payment payable out of transferred property" on the one hand, and "the retention of a 'right to income'" on the other. *Id.* Contending that section 2036 applies only to the latter, Plaintiff argues that (1) income and a fixed annuity payment are distinct because the former fluctuates while the latter does not; (2) a right to income connotes an "ascertainable and legally enforceable power" to receive income, which Patricia lacked; and (3) Patricia's annuity could have been satisfied with "income and principal, or principal only." Pl. Opp. at 8-9.

The Court finds that section 2036 applies to Patricia's GRAT. At oral argument, both parties acknowledged the lack of binding authority squarely addressing the issue presented here. Plaintiff is accordingly correct that Defendant's authorities do not expressly equate a fixed-term "annuity" with a right to income or some other possession or enjoyment. Nonetheless, the U.S. Supreme Court has adopted a substance-over-form approach that favors a finding that Patricia's annuity comprises some possession, enjoyment, or right to income from the transferred property.

The Court first articulated its pragmatic approach to the IRC's possession, enjoyment, or right to income language in *Hallock*. *See* 309 U.S. at 109. Specifically, the *Hallock* Court considered whether the IRS Commissioner correctly calculated the gross estate tax of several decedents to include trust properties transferred inter vivos. *See id.* Though each conveyance was unique, all of the "dispositions of property by way of trust" included a settlement "provid[ing] for return or reversion of the corpus to the donor upon a contingency terminable at his death." *Id.* at

110.

The Court in *Hallock* concluded that the Commissioner had properly calculated the decedent's gross estate taxes to include the trust properties. In so holding, the Court stated that the grantor's reservation of any interest, however remote, was sufficient to bring the conveyance within the code's "possession or enjoyment" language. *See id.* at 111-12 (finding non-dispositive the "technical forms in which interests contingent upon death are cast" (citing *Klein v. United States*, 283 U.S. 231 (1931)). The Court expressed concerns with importing "distinctions and controversies from the law of property into the administration of the estate tax" that would "preclude[] a fair and workable tax system." *Id.* at 118. The Court emphasized a "harmonizing principle" from its earlier decision in *Klein*:

> [T]he statute taxes not merely those interests which are deemed to pass at death according to refined technicalities of the law of property. It also taxes inter vivos transfers that are too much akin to testamentary dispositions not to be subjected to the same excise. By bringing into the gross estate at his death that which the settlor gave contingently upon it, this Court fastened on the vital factor. It refused to subordinate the plain purposes of a modern fiscal measure to the wholly unrelated origins of the recondite learning of ancient property law.

*Id.* at 112, 118. The Court found that this principle reduced the prospect that a "change merely in the phrasing of a grant" could create a "judicially cognizable difference" in the application of the tax code. *Id.* at 112.

Building on this substantive approach, the Court in *Church's* read *Hallock* as extending section 811(c)'s possession or enjoyment "string" to apply to "*any trust transfer except by a bona fide transfer* in which the settlor, absolutely, unequivocally, irrevocably, and without possible reservations, parts with all of his title and all of his possession and all of his enjoyment of the transferred property." 335 U.S. at 645 (emphasis added). The Court continued:

> After such a transfer has been made, the settlor must be left with no present legal title in the property, no possible reversionary interest in that title, and no right to possess or to enjoy the property then or thereafter. In other words such a transfer must be immediate and out and out, and must be unaffected by whether the grantor lives or dies.

*Id.* at 645-46. The Court again prioritized pragmatic considerations, noting that "[t]estamentary dispositions of an inter vivos nature cannot escape the force of this section by hiding behind legal

9

niceties contained in devices and forms created by conveyancers." *Id.* at 646 (quoting *Goldstone v. United States*, 325 U.S. 687, 690 (1946)). The Court found that the Commissioner had properly calculated the decedent's gross estate tax by including the trust corpus. *Id.* at 323-24. The Court reasoned that the decedent, who retained both the possibility of reverter and required the "trustees to pay him income for life," continued to possess and enjoy the property (there, stocks) that he had previously owned and then transferred to the trust. *Id.* at 634, 644. The Court found that "passage of the mere technical legal title to a trustee is not necessarily crucial in determining whether and when a gift becomes 'complete' for estate tax purposes." *Id.* at 644-45. Looking to "substance and not merely form," the Court concluded that the decedent "retained for himself until death a most valuable property right in these stocks—the right to get and to spend their income." *Id.*

In *Spiegel's*, the Court reaffirmed that section 811(c)'s applicability hinges primarily "on the nature and operative effect of the trust transfer." 335 U.S. at 705. Notably, the view of the *Spiegel's* Court supports Defendant's broad reading of *Church's* and of section 2036. *See* 335 U.S. at 705 (quoting 335 U.S. 632). The Court in *Spiegel's*, moreover, arguably extended *Church's* further by emphasizing that the settlor's intent to retain a reversionary interest does not bear on the "possession or enjoyment" inquiry. *Id.* Instead, the grantor's retention of any "absolute or contingent" "present or future interest" vitiates the "'complete' kind of transfer" required to show that the grantor "has certainly and irrevocably parted with his 'possession or enjoyment.'" *Id.* The Court emphasized that "*[a]ny* requirement less than that. . . such as a post-death attempt to probe the settlor's thoughts in regard to the transfer," would facilitate circumvention of the section, and thus frustrate Congress's legislative intent. *Id.* at 706 (emphasis added).

Based on the Supreme Court's pragmatic approach to section 2036's operative language, Patricia's right to a fixed-annuity payment from the GRAT brought her transferred property within the meaning of that section. The undisputed facts show that: (1) Patricia funded the GRAT with her one-half interest in Y&Y Co.; (2) the three Y&Y Co. properties were placed into the GRAT; (3) Patricia's transfer of her one-half interest was not a bona fide sale, and no consideration was given; (4) the income generated by the GRAT each year was greater than Patricia's annual

10

annuity; and (5) Patricia died before the GRAT's expiration.  *See* Badgley Dep., 16:1-9, 30:23-31:3, 56:14-25; Pamela Yoder Dep., 27:12-19, 32:21-24, 71:15-22; RFA #49; Def. Exs. 8-12; Pl. Exs. M-Q, R-T; Def. Mot. at 7; Pl. Mot. at 14.  Plaintiff does not dispute, and there is no evidence to show, that any of the three properties constituting the original trust corpus were ever sold to fund Patricia's annuity.  *See* Def. Opp. at 7.[7]  As a result, Patricia's annuity necessarily drew either from the GRAT's accumulated income (i.e. the principal) *or* the current income that flowed into the GRAT each year from the rents received through Y&Y Co.  Def. Mot. at 13; Def. Reply at 5.  Plaintiff sets forth no legal basis for distinguishing these two funding sources within the meaning of section 2036 or its predecessors.  *See* Pl. Opp. at 8-9.

The Third Circuit's decision in *McNichol's Estate v. C.I.R.*, 265 F.2d 667, 673 (3d Cir. 1959) is persuasive, and supports a finding that Patricia's annuity provided her with some possession, enjoyment, or right to income within the meaning of section 2036.  *See* Def. Mot. at 7.  In *McNichol's*, the Third Circuit considered whether several income-producing real estate properties were properly included in a decedent's gross estate.  *See* 265 F.2d at 668.  The decedent had orally transferred the properties to his children, and his children "orally understood" that "the decedent should retain for his lifetime the income from the real estate." *Id.*  Despite that the decedent had not expressly reserved an "enforceable claim to the income" in the trust document, the Third Circuit held that section 811(c)(1)(B) applied.  *Id.* at 670-73.  So holding, the Third Circuit found that section 811(c) applied even where a reserved "life interest" was "retained in connection with or as an *incident* to the transfer." *Id.* at 670 (emphasis added).  The court also concluded from 811(c)'s legislative history that Congress added the "right to income" language to extend the statute's application to "cases where a decedent was entitled to income even though he did not actually receive it." *Id.* at 671.  "Hence," the Court continued, "the 'right to income'

---

[7] Even if Patricia *had* sold one of these properties to fund the annuity, that would likely also constitute some "use and enjoyment" of the property sufficient for section 2036.  *See* Def. Reply at 8 n.5.  Plaintiff does not expressly respond to that argument.  Rather, Plaintiff states that "as a matter of policy. . . section 2036(a)(1) should not depend on the exercise of the trustee's discretion whether or not to sell the transferred property." *See* Pl. Opp. at 11–12.  Plaintiff cites no authority for that proposition.  Plaintiff's argument also contravenes the above discussed concern of the U.S. Supreme Court regarding the use of testamentary instruments to shield property from taxation.

11

clause, instead of circumscribing the 'possession or enjoyment' clause in its application to retained income, broadened its sweep." *Id.*

Pursuant to that understanding of Congress's purpose, the *McNichol's* court held that the decedent's receipt of rents from the properties in the trust constituted enjoyment of the transferred properties. *Id.* at 671. The court also found that "[e]njoyment" was "synonymous with substantial present economic benefit." *Id.* (citing *Commissioner v. Estate of Holmes*, 326 U.S. 480 (1945)). *McNichol's* then reconciled this pragmatic view of "enjoyment" with *Church's* repeated reference to a "property right" in "income." *Id.* at 673. *McNichol's* opined that *Church's* somewhat narrow emphasis on a "right" was "patterned to fit" the factual situation confronting that Court (i.e. "a transfer of property under a formal trust agreement in which the trustor retained an enforceable right to the income"). But:

> [A]s we read the decision its bite goes deeper; and the opinion constitutes a sweeping and forthright declaration that technical concepts pertaining to the law of conveyancing cannot be used as a shield against the impact of death taxes when in fact possession or enjoyment of the property by the transferor—and more particularly his enjoyment of the income from the property—ceases only with his death.

*Id.* This reading of *Church's* aligns with Defendant's argument here.

In line with these pragmatic concerns, the Court agrees with Defendant that differentiating between annuities based on their funding source would facilitate circumvention of the tax code. For instance, an individual could substitute the word "income" for annuity in a trust document, give property to the trust, and structure the trust so that the annuity payment is less than the amount of income generated. *See* Def. Reply at 5. Consequently, the property in the trust (that is, the original corpus) would never need to be sold, and could pass to eventual beneficiaries free of taxation. In addition, an individual could "select[] an investment such as a mutual fund from which annuity payments could be made from capital distributions, as opposed to current income," and call the payout an annuity. Def. Mot. at 16. Plaintiff does not respond to either circumstance beyond asserting that policy decisions should be left to Congress. *See* Pl. Opp. at 20-21. But these examples of circumvention illustrate the types of circumstances that have motivated the Supreme Court's pragmatic substance-over-form approach.

12

Plaintiff contends that Patricia could have no "right to income" because she did not have an "ascertainable and legally enforceable power" to receive income from the transferred property. Pl. Opp. at 9. For support, Plaintiff highlights that Y&Y Co.'s income fluctuated while Patricia's annuity remained constant. *See id.* at 8-9. This argument fails. As a threshold, it assumes that income and annuity are distinct for the purpose of section 2036, but as explained above the Court disagrees with that conclusion. In addition, Plaintiff relies for her interpretation of "right" on *United States v. Byrum*, 408 U.S. 125, 136-37 (1972). But the *Byrum* Court construed the "right" language in section 2036(a)(2)—not section 2036(a)(1).[8] The Supreme Court has not expressly extended its interpretation of that subsection to section 2036(a)(1). Finally, Plaintiff admits that an "implied right to income" can exist when "annuity payments are no more than disguised payments of income." Pl. Mot. at 17 n.8. That implied right exists here because: (1) Patricia created the original trust corpus with her one-half share in Y&Y Co. including the three Southern California properties; (2) there is no evidence that any of those properties were ever sold off; and (3) Y&Y Co.'s income was always greater than Patricia's annuity payment. *See* Badgley Dep., 16:1-9, 30:23-31:3, 56:14-25; Pamela Yoder Dep., 27:12-19, 32:21-24, 71:15-22; RFA #49; Def. Exs. 8-12; Pl. Exs. M-Q, R-T; Def. Mot. at 7; Pl. Mot. at 14. The income from Y&Y Co., whether accumulated or current, thus always funded Patricia's annuity. And Patricia expressly reserved that annuity right in the GRAT. *See* GRAT 1-3.

Apart from whether Patricia enjoyed a "right to income" from the GRAT, Plaintiff contends that Patricia's fixed-annuity could not constitute some other "possession or enjoyment." Specifically, Plaintiff asserts that enjoyment is equivalent to "right to income," which Patricia lacked, and that "possession" applies only where the property owner continues to possess or use the property for the remainder of her life. Pl. Mot. at 20-21. As discussed, Patricia did enjoy a "right to income" within the meaning of section 2036(a)(1). And even if Patricia lacked a right to income, she still enjoyed the property given her access to current and/or accumulated income

---

[8] Section 2036(a)(2) extends to an individual with "the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom."

13

from her interest in Y&Y Co. That is sufficient to bring the GRAT within the meaning of section 2036.[9]

### B. The Regulation is a Reasonable Interpretation of Section 2036

Treasury Regulation 20.2036-1(c)(2)(i) requires that transferred GRAT property be included in a decedent's gross estate under section 2036 where the decedent retains an annuity interest and dies before the expiration of the GRAT term:

> This paragraph (c)(2) applies to a grantor's retained use of an asset held in trust or a retained annuity... including without limitation ... a grantor retained annuity trust (GRAT) paying out a qualified annuity interest within the meaning of §25.2702-3(b) of this chapter. . .
>
> If a decedent transferred property into such a trust and retained or reserved the right to use such property, or the right to an annuity, unitrust, or other interest in such trust with respect to the property decedent so transferred for decedent's life, any period not ascertainable without reference to the decedent's death, or for a period that does not in fact end before the decedent's death, then the decedent's right to use the property or the retained annuity, unitrust, or other interest (whether payable from income and/or principal) constitutes the retention of the possession or enjoyment of, or the right to the income from, the property for purposes of section 2036.[10]

Plaintiff contends that the Court should disregard the Regulation as an unreasonable interpretation of section 2036 as applied to Patricia's GRAT. *See* Pl. Mot. at 24 (citing *Prof'l Equities v. Commissioner*, 89 T.C. 165 (1987)). Defendant argues that the Regulation is a reasonable interpretation of section 2036 and valid under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Plaintiff does not expressly dispute that *Chevron* applies; instead, Plaintiff claims that the Regulation is interpretive and thus given less deference as compared to a legislative rule. *See* Pl. Opp. at 19.

The Court applies *Chevron*'s two-step framework. *See Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 52 (2011). At *Chevron* step one, the Court asks "whether

---

[9] Because the Court finds this basis sufficient to justify including Patricia's GRAT within the gross estate, the Court does not decide whether Patricia retained some "other interests and powers" in Y&Y Co. that are sufficient to show possession or enjoyment of the property. *See* Def. Mot. at 12.
[10] There is no dispute that Patricia's annuity was a "qualified annuity interest." *See* Def. Mot. at 10-11, 13.

14

Congress has directly addressed the precise question at issue." *Id.* (quotation omitted). The parties agree that section 2036 does not expressly address whether annuity payments constitute some possession, enjoyment, or right to income from the transferred property. Def. Mot. at 14; Pl. Mot. at 19. So the Court proceeds to step two. At that step, the Court "may not disturb an agency rule unless it is arbitrary or capricious in substance, or manifestly contrary to the statute." *Mayo Found. for Med. Educ.*, 562 U.S. at 53 (quotation omitted).

The Court concludes that the Regulation is reasonable, and valid under *Chevron*. In drafting the Regulation, the IRS and Treasury Department relied principally on the above discussed binding authorities, including *Church's*, *Hallock*, and *Spiegel's*. *See* Grantor Retained Interest Trusts—Application of Sections 2036 and 2039, T.D. 9414, 73 Fed. Reg. 40173-01 (July 14, 2008) at 40174. Those cases support Defendant's view of section 2036, which parallels the Regulation's interpretation of that section. The IRS and Treasury Department also drew on section 2036's legislative history to devise the Regulation, observing that Congress amended section 811(c) to include interests retained for a term of years. *Id.* (citing H.R. Rep. no. 81-1412 at 9 (1949)). Though Plaintiff cites legislative history for the opposite conclusion, Plaintiff does not explain why that history supports the Regulation. *See* Pl. Opp. at 20.

In addition, Defendant persuasively sets forth several of the Regulation's administrative benefits. Those benefits include, for instance, consistency with trust accounting regulations under section 662. 73 Fed. Reg. 40173-01 at 40174. In explaining this benefit, the implementing agencies declined to adopt the distinction that Plaintiff draws here between annuities funded from current income and those funded from accumulated income. *See id.* at 40175. In doing so, these agencies observed that Plaintiff's interpretation "would condition the estate tax treatment on the nature and performance of the investments selected by the trustee." *Id.* The agencies reasonably concluded that section 2036's application should not hinge on discretionary investment decisions or investment performance.

Plaintiff argues that the Regulation is invalid because Section 2036 does not equate "income" with a fixed-term annuity in section 2036. Pl. Opp. at 19-20. That silence does not mean that the agencies' interpretation of the section is arbitrary or capricious. For the reasons

15

stated, the Court concludes that the Regulation is a permissible interpretation of Section 2036. Plaintiff also contends that the regulation is arbitrary because it: (1) would result in inclusion of all private annuities in a decedent's gross estate, thereby contradicting cases standing for the opposite proposition; and (2) is overly broad to the extent that the Regulation subsequently includes GRATs like Patricia's that "have no ordering rule, do not provide for income payments disguised as annuity payments, and at the time of the grantor's death can satisfy the annuity payments entirely out of principal." *See* Pl. Mot. at 23-25. Plaintiff's second argument fails once the Court rejects her annuity/income distinction.

Plaintiff's first argument is similarly unavailing. For that argument, Plaintiff relies on *Lafargue v. Commissioner,* 689 F.2d 845 (9th Cir. 1982). But Plaintiff's claim ignores the long-recognized difference between property transferred through a bona fide sale in exchange for an annuity, and property transferred through a trust in the absence of a bona fide sale:

> In the bona fide sale, there is a negotiation and agreement between two parties, each of whom is the owner of a property interest before the sale; each uses his or her own property to provide consideration to the other in exchange for the property interest to be received from the other in the sale. When the transferor retains an annuity . . . interest in the transferred property (as in the case of a GRAT or GRUT), the transferor is not selling the transferred property to a third party in exchange for an annuity because there is no other owner of property negotiating or engaging in a sale transaction with the transferor. The transferor, instead, is transferring the property subject to a retained possession and enjoyment of, or right to, the income from the property.

73 Fed. Reg. 40173-01 at 47015. And it was the finding of a bona fide sale upon which the Ninth Circuit relied in *LaFargue*. *See* 689 F.2d at 846-47 ("Under these circumstances, absent some indication that the annuity payment agreed upon is a mere disguise for transferring the income of the trust to the grantor, rather than a payment for the property transferred, we cannot justify disregarding the formal structure of the transaction as a sale in exchange for an annuity."). Plaintiff does not explain how the Regulation would otherwise collapse the section's "bona fide sale" exception.

Finally, Plaintiff claims that the Regulation is invalid because the formula it uses to determine the includable value of the GRAT corpus assumes that annuity is paid solely from

16

income. *See* Pl. Opp. at 20. Plaintiff points out that an annuity can, in fact, be paid either from principal or from income. *See id.* Plaintiff asserts that the agencies' formula thus yields a capriciously large amount includable for taxation. *See id.*

In response, Defendant explains that the agencies' formula reasonably "looks to the amount of property needed, given the interest rate at the time of death, to fund the annuity." Def. Reply at 12. In doing so, the formula focuses on two factors: first, the value of property, in order to address Congress's principal concern that donors might use trusts to hide properties from the estate tax; and second, interest, which "valuing an annuity necessarily requires." *Id*. Defendant explains that, because the interest rate was low at the time of Patricia's death, "the amount of property needed to generate the total annuity payment" was much greater than the amount actually included in the GRAT. *Id.* In other words, the high taxation rate in the instant case is partly a result of interest rate fluctuation. The Court concludes that this explanation of the IRS's formula is persuasive and well-reasoned. Accordingly, the Court concludes that the Regulation is reasonable, and Patricia's GRAT was properly included in calculating Patricia Yoder's gross estate.

## IV.  CONCLUSION

For these reasons, the Court **GRANTS** Defendant's motion for summary judgment, and **DENIES** Plaintiff's motion for summary judgment. The clerk is directed to enter judgment in accordance with this order in favor of Defendant and to close the case.

**IT IS SO ORDERED.**

Dated: 5/17/2018

HAYWOOD S. GILLIAM, JR.
United States District Judge